# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-00659-COA

**MITCHELL ROBERTS A/K/A JAMES MITCHELL ROBERTS A/K/A MITCHELL JAMES ROBERTS A/K/A MITCHELL J. ROBERTS A/K/A JAMES ROBERTS**

**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**

**APPELLEE**

DATE OF JUDGMENT: 04/06/2016
TRIAL JUDGE: HON. LESTER F. WILLIAMSON JR.
COURT FROM WHICH APPEALED: LAUDERDALE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER
BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: BARBARA W. BYRD
DISTRICT ATTORNEY: BILBO MITCHELL
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED: 10/17/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE GRIFFIS, P.J., CARLTON AND GREENLEE, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1. Mitchell James Roberts was convicted of aggravated driving under the influence (DUI) after a jury found that he operated a motor vehicle while under the influence of an intoxicating substance, specifically, Xanax, which impaired his ability to drive, and negligently caused the death of Arnold Altman Jr. Roberts was sentenced to twenty-five years, with seven years suspended, leaving eighteen years to serve in the custody of the Mississippi Department of Corrections, followed by five years of postrelease supervision.

Additionally, Roberts was ordered to pay all court costs, a $2,000 fine, and restitution in the amount of $7,150. Following the denial of his posttrial motions, Roberts timely appealed. Upon review, we find no error and affirm.

FACTS

¶2. On July 13, 2013, around 3:00 p.m., fourteen-year-old Altman Jr., who was a passenger in his father's automobile, died when his father's vehicle was struck head-on by a truck driven by Roberts. The accident occurred on a four-lane bridge on Highway 19 in Meridian.

¶3. At the time of the accident, Altman Jr. and his father were traveling to the store. As they were driving, a truck, driven by Roberts and traveling in the opposite direction, crossed the median-like lane, veered into the Altmans' lane of traffic, and struck the passenger side of the Altmans' vehicle head-on, killing Altman Jr. Many witnesses observed the accident and offered their assistance. Two of the witnesses, Margaret Davis and Stephanie Ruffin, were nurses and testified at trial.

¶4. Davis testified that she and her husband were traveling on Highway 19 when Roberts's truck veered toward their vehicle. Davis commented to her husband that the driver almost hit them. As her husband continued to drive, Davis turned around and saw the truck veer into oncoming traffic and "implode" into the Altmans' vehicle. Davis and her husband turned around in order to provide assistance. Davis initially went to Roberts's vehicle and attempted to give him aid. However, Roberts was incoherent. Davis stated that Roberts was awake, but out of it and could not form a sentence.

2

¶5. In an attempt to explain Roberts's behavior following the accident, defense counsel suggested that Roberts was suffering from retrograde amnesia. While Davis acknowledged that retrograde amnesia was common in people involved in automobile crashes, she did not think Roberts was suffering from amnesia, but instead thought he appeared to be under the influence of drugs or alcohol. Davis described Roberts's face as "diaphoretic," or sweaty, and his pupils as "pinpoint."

¶6. Ruffin also saw Roberts veer out of his lane of traffic. Ruffin stated it was not an abrupt move, but instead described Roberts as "gradually drifting" out of his lane. Based on Roberts's driving, Ruffin assumed he was texting and driving. However, Ruffin stated her assumption changed when she saw the impact.

¶7. Ruffin initially went to the Altmans' vehicle and helped Altman out of the car. However, she noticed Altman Jr. was not responsive and did not have a pulse. She then went to Roberts's truck. Ruffin described Roberts as "in and out" and stated his speech was slurred. When Ruffin asked Roberts what had happened, Roberts responded that he had "blacked out" or "blanked out."

¶8. Detective Greg Crain of the Meridian Police Department testified that he was called to the scene of the accident at approximately 3:30 p.m. After Crain assessed the scene and took photographs, he went to the hospital, where he eventually spoke with Roberts. Roberts told Crain that the last thing he remembered was leaving his friend's house in Collinsville. Roberts asked Crain how the passenger of his truck was doing. However, Crain explained to Roberts that he was the only person in his vehicle. Although Roberts did not recall what

3

he was doing at his friend's house, he admitted to Crain that he had consumed two beers prior to the accident.

¶9.    Crain executed an affidavit and obtained a search warrant in order for a sample of Roberts's blood and urine to be seized and tested for the presence of drugs and alcohol. The samples were collected at 6:35 p.m., over three hours after the accident occurred.

¶10.    Kara Jackson, a hospital nurse who treated Roberts in the emergency room, testified that Roberts arrived at 3:28 p.m. and was agitated and cursing, but alert, oriented, and able to follow commands. Jackson described Roberts's eyes as reactive, equal in size, and small, but not pinpoint. According to Jackson, Roberts's skin was not diaphoretic when he arrived at the hospital.

¶11.    Jackson noted that Roberts was experiencing "amnesia event retrograde," since he could not recall any details of the accident. However, Dr. Lindsey Prewitt, an internal-medicine doctor, testified that based on her consultation with Roberts, there was no indication of retrograde amnesia, and there was nothing in his medical history to support such a finding. Additionally, Dr. William Billups III, a surgeon who treated Roberts in the emergency room, testified that based on his consultation with other specialists, there was no indication of any underlying medical problems, including head injury or seizure, which might have caused or contributed to the accident.

¶12.    When asked about his medical history, Roberts advised the hospital staff that he was not taking any medications and was not being treated for any medical issues. However, the blood test revealed Roberts had benzodiazepines in his system. Specifically, the compound

4

identified in his system was alprazolam, otherwise known as Xanax.[1]  Further testing

revealed Roberts had fifty-one nanograms per milliliter of Xanax in his system.  According

to expert testimony, this amount of Xanax is within the therapeutic range.  Roberts did not

test positive for alcohol.

¶13.    Maury Phillips, the State's toxicology expert, testified that Xanax is usually prescribed

to manage anxiety or panic disorders.  Phillips stated that the two most common side effects

of Xanax are drowsiness and light-headedness, but also include confusion, sweating, slurred

speech, pinpoint pupils, and "syncope," which "means that you might faint or black out."

Phillips explained that the effects of and tolerance to Xanax varied from person to person and

were influenced by the duration of use and the amount taken.

¶14.    Importantly, Phillips testified that impairment can still occur within the therapeutic

range.  He explained that there was not a direct correlation between driving impairment and

drug concentration "like we have for alcohol to say that if you're a certain number, you're

impaired."

¶15.    Phillips admittedly did not review Roberts's medical records and was unable to render

an opinion as to whether Roberts was driving impaired based on the concentration of Xanax

alone, since the amount in his system was within the therapeutic range.  According to

Phillips, in order to make an assessment about drug-induced driving impairment, you must

consider all of the evidence, including the particular events surrounding the accident, any

eyewitness testimony, the results of the toxicology report, and the individual's information,

---

[1] It is undisputed that Roberts was not administered Xanax while in the hospital.

5

such as his medical history, drug tolerance, and reason for the drug use.

¶16.    Roberts's information and medical history regarding his use of Xanax, including the duration of use, the amount taken, and the reason for use, or whether the medication was even prescribed, was unknown.[2]    However, Phillips stated that Davis's and Ruffin's observations at the accident scene, along with the testimony regarding Roberts's erratic driving, were indicators of impairment.

¶17.    Dr. Richard Ogletree Jr., an expert in toxicology and pharmacology, testified on behalf of Roberts.    When asked whether Roberts was impaired, Ogletree, like Phillips, stated that such a determination required specific clinical observations in addition to blood-concentration levels.  However, unlike Phillips, Ogletree reviewed Roberts's medical records and stated there was no evidence of impairment in the records.  Ogletree stated he could not consider Davis's and Ruffin's observations at the accident scene, since they were not made under clinical conditions, nor were they contemporaneously recorded.

¶18.    Ogletree testified that while fifty-one nanograms of Xanax per milliliter of blood is in the middle of a therapeutic range, a person could still be impaired with such a blood-concentration level.  Ogletree agreed that tolerance is important in determining impairment, but could not state whether Roberts had built up a tolerance, since he had not spoken with Roberts or reviewed any medical history or medical records, other than those related to the accident.

¶19.    Prior to trial, Roberts moved to suppress the results of the blood sample seized

_____

[2] The record shows Roberts did not disclose to anyone, including his own expert, any information regarding his use of Xanax.

pursuant to the search warrant obtained by Crain. Roberts claimed "there was no probable cause to believe that [he] was operating a motor vehicle under the influence of drugs and/or alcohol," and, therefore, no "substantial credible evidence" existed to support the issuance of the search warrant. A motion hearing was held wherein Crain and the municipal court judge who issued the search warrant testified. The circuit court subsequently denied the motion to suppress.

¶20. Following his conviction, Roberts filed a motion for a judgment notwithstanding the verdict and a motion for a new trial, both of which were denied. Roberts now appeals and argues: (1) the evidence was insufficient to support the verdict , (2) the verdict was contrary to the overwhelming weight of the evidence, (3) his confrontation rights were compromised since the circuit court allowed the technical reviewer to testify in lieu of the actual crime-lab analyst, (4) the circuit court erroneously denied his motion to suppress since there was insufficient probable cause to issue the search warrant, and (5) he received an "unfair" trial as a result of the prosecutor's improper closing arguments.

## ANALYSIS

### I. *Sufficiency of the Evidence*

¶21. In considering whether the evidence is sufficient to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005) (citation omitted). Where the facts and inferences "point in favor of the defendant on any element of the offense

7

with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty," the proper remedy is to reverse and render. *Id*. However, if "reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense, the evidence will be deemed to have been sufficient." *Id*. (citation and internal quotation marks omitted).

¶22. Roberts was convicted of aggravated DUI in violation of Mississippi Code Annotated section 63-11-30(5) (Rev. 2012). The essential elements for such offense are:

> (1) that the defendant negligently caused the death, disfigurement, or permanent disability . . . of another (2) while operating a motor vehicle under the influence of alcohol or [any other substance,] which has impaired such person's ability to operate a motor vehicle.

*Irby v. State*, 49 So. 3d 94, 99 (¶11) (Miss. 2010) (citing Miss. Code Ann. § 63-11-30(1)(b), (5)).

¶23. It is undisputed that Roberts negligently caused the death of Altman Jr. However, Roberts claims the State failed to prove that he was "operating [his] motor vehicle under the influence of . . . [any substance,] which . . . impaired [his] ability to" drive. *Id*. We disagree and find sufficient evidence to support the verdict.

¶24. The testimonial evidence indicates Roberts swerved recklessly while he drove and was unable to maintain his lane of traffic or control of his vehicle. Testimony further shows Roberts exhibited the side effects of Xanax, including disorientation, confusion, slurred speech, pinpoint pupils, diaphoretic, and syncope.

¶25. While both experts opined that the amount of Xanax in Roberts's system was within the therapeutic range, both agreed that the amount was at a level that could cause impairment

and affect his ability to drive. Phillips testified that eight to 640 nanograms per milliliter was the range for DUI-reported arrests. Thus, the amount in Roberts's system was within a range that caused or contributed to impaired driving in people who had been arrested for DUI.

¶26. Additionally, Ogletree testified regarding a study wherein the test subjects were given one milligram of Xanax. The results showed that one milligram of Xanax, which would equate to around ten nanograms per milliliter in the blood, had a significant impact on the person's ability to drive. In fact, six out of ten people fell asleep during the study and could not continue to drive. The study showed photographs of the participants "swerving across the road." Here, the record shows Roberts had fifty-one nanograms per milliliter of Xanax in his blood, five times the amount in the study.

¶27. Both experts agreed that how often a person takes Xanax would affect any reaction he or she experienced. For instance, a person who takes Xanax acutely, or once in a while, would experience more of an effect than a person who had been taking the drug chronically, or multiple times a day for a period of weeks. Whether Roberts took Xanax once or whether he had taken it chronically is unclear. However, it is clear, based on the record, that Roberts was operating a motor vehicle while under the influence of Xanax and exhibited signs of impairment.

¶28. Based on the evidence presented, and considering the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Accordingly, we find sufficient evidence exists to support the verdict. Thus, Roberts's motion for a judgment notwithstanding the verdict was properly

9

denied.

## II. Weight of the Evidence

¶29. "When reviewing a denial of a motion for new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (¶18). The evidence is weighed in the light most favorable to the verdict. *Id.*

¶30. Here, the prosecution showed Roberts had Xanax in his system at the time of the accident and exhibited signs of impairment. The fact that conflicting evidence was presented does not warrant the granting of a new trial. *See Williams v. State*, 64 So. 3d 1029, 1032 (¶10) (Miss. Ct. App. 2011) ("[A] new trial should be [granted] only in exceptional cases in which the evidence preponderates heavily against the verdict."). "The jury is the sole judge of the weight of the evidence and the credibility of the witnesses." *Id.* at 1033 (¶13). "Conflicts in the evidence are for the jury to resolve." *Id*.

¶31. Having considered the evidence presented, we do not find the verdict to be so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice. Accordingly, we find the circuit court's denial of Roberts's motion for a new trial was proper.

## III. Roberts's Confrontation Rights

¶32. Phillips, the supervisor for the toxicology and implied-consent section of the Mississippi Forensics Laboratory, testified regarding the results of Roberts's blood and urine

10

tests. Although Phillips did not conduct the testing of Roberts's blood and urine, he served as the technical and administrative reviewer of the primary analyst's testing and released the report.[3]

¶33. Roberts claims that since Phillips was not actively involved in the production of the lab report and did not reveal an intimate knowledge about the testing, he should not have been allowed to testify in lieu of the primary analyst who conducted the tests and issued the report. As a result, Roberts claims his "rights to confront his accusers were circumvented."

¶34. In criminal cases, the accused has a constitutional right to confront the witnesses against him. U.S. Const. amend. VI; Miss. Const. art. 3, § 26. The Mississippi Supreme Court has held that a supervisor, reviewer, or other analyst may testify in lieu of the primary analyst where the surrogate witness was "actively involved in the production of the report and had intimate knowledge of the analyses even though [he or] she did not perform the tests first hand." *McGowen v. State*, 859 So. 2d 320, 340 (¶68) (Miss. 2003). Additionally,

> when the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity, such as by performing procedural checks, then the testifying witness's testimony does not violate a defendant's Sixth Amendment rights.

*Id*. at 339 (¶68).

¶35. Here, Phillips was a court-accepted expert in the field of toxicology. The record shows Phillips was actively involved in the production of the report, had intimate knowledge of the tests that were performed and the process that was used to confirm the findings, and

---

[3] The primary analyst was Duriel McKinsey. At the time of trial, McKinsey was no longer employed at the crime lab and no longer lived in Mississippi.

11

reviewed the analyst's work, including the data, to ensure that the conclusions were correct and accurate.

¶36.    Specifically, Phillips testified that once an analyst has completed the analysis, his work packet is submitted for review. Phillips explained that all reports issued by an analyst must be technically and administratively reviewed before they are released. Phillips stated that as the technical and administrative reviewer in this case, he verified that the analyst followed protocol and used the proper scientific methods of toxicology. Moreover, Phillips stated he received the analyst's work packet "with all of the data" and examined it to ensure that the policies were followed and that the analyst's conclusions were accurate and correct. We find Phillips, as the technical and administrative reviewer, was qualified to testify as a surrogate witness in lieu of the primary analyst.

¶37.    Roberts further claims Phillips, as a surrogate witness, never rendered his own independent opinion, but instead "[became] a mere hearsay conduit for the original analyst." Roberts argues that "[n]ot requiring a surrogate witness . . . to render an independent opinion is, therefore, inconsistent with Rule 703 [of the Mississippi Rules of Evidence]." We disagree.

¶38.    At the time of trial, Rule 703[4] stated as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

_____

[4] The Mississippi Rules of Evidence were stylistically revised, effective July 1, 2016.

Rule 703 allows an expert to base his opinion on the opinions of others which are not in evidence "so long as experts in the field ordinarily rely on such opinions in forming their own opinions." *Alexander v. State*, 759 So. 2d 411, 420 (¶30) (Miss. 2000). The Mississippi Supreme Court has held that the opinion of a nontestifying expert is a type of evidence reasonably relied upon by experts in forming their own opinions. *Id.* at (¶¶29-31). Thus, it is admissible hearsay when relied on by a testifying expert. *Id.*

¶39. Phillips offered his expert opinion as the technical and administrative reviewer of the primary analyst's testing. The record shows Phillips testified regarding his findings and analysis of the work and data generated by the primary analyst. Phillips opined that based on the screening methods used and the findings that he confirmed, Roberts's blood was positive for benzodiazepines, and that the compound in Roberts's blood was alprazolam, otherwise known as Xanax. Thus, the record makes clear that Phillips was not "so far removed from the analysis as to be essentially a records custodian for the purposes of testifying at trial." *McGowen*, 859 So. 2d at 339 (¶68).

¶40. Overall, we find Phillips's testimony did not violate Roberts's constitutional right to confront witnesses against him and was permissible under Rule 703. *See Byrd v. State*, 741 So. 2d 1028, 1033 (¶23) (Miss. Ct. App. 1999) (finding defendant in a rape trial was not denied confrontation when the DNA expert had not performed or observed the DNA testing procedures, but testified to her analysis of the scientific data obtained from the technicians).

IV. *Motion to Suppress*

¶41. At the hearing on the motion to suppress, the municipal court judge who issued the

search warrant testified that "the only substance that was brought to [his] attention was alcohol." As a result, Roberts claims the search warrant used to seize his blood was invalid, as no probable cause existed for a drug analysis. Thus, Roberts argues the circuit court erred in denying his motion to suppress.

¶42. "The Fourth Amendment prohibition against unreasonable search and seizure applies when an intrusion into the body—such as a blood test—is undertaken without a warrant, absent an emergency situation." *Cole v. State*, 493 So. 2d 1333, 1336 (Miss. 1986). "A search warrant is validly issued when based upon probable cause." *Thompson v. State*, 92 So. 3d 691, 695 (¶8) (Miss. Ct. App. 2012) (quoting *Phinizee v. State*, 983 So. 2d 322, 328 (¶18) (Miss. Ct. App. 2007)). Our supreme court has described probable cause as follows:

> Probable cause is a practical, nontechnical concept, based upon the conventional considerations of everyday life on which reasonable and prudent men, not legal technicians, act. It arises when the facts and circumstances within an officer's knowledge, or of which he has reasonably trustworthy information, are sufficient in themselves to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it.

*Id.* (citation omitted).

¶43. "Probable cause exists where it is based on 'information reasonably leading an officer to believe that then and there contraband or evidence material to a criminal investigation would be found.'" *Id.* at 696 (¶9) (quoting *Phinizee*, 983 So. 2d at 328 (¶18)). "[P]robable cause is determined by assessing the 'totality of the circumstances.'" *Id.* In reviewing a finding of probable cause, "this Court does not make a de novo determination of probable cause, but only determines if there was a substantial basis for the determination of probable

cause." *Id*. at 695 (¶7) (quoting *Roebuck v. State*, 915 So. 2d 1132, 1137 (¶12) (Miss. Ct. App. 2005)). "On appeal, the issuance of a warrant will not be reversed where substantial evidence supports the [issuing judge's] determination that probable cause existed." *Phinizee*, 983 So. 2d at 328 (¶18).

¶44. According to his affidavit and testimony at the suppression hearing, Crain had information that witnesses observed Roberts's erratic driving and saw him cross over into the oncoming lane of traffic. Additionally, Crain was advised that prior to the accident, an anonymous caller had contacted law enforcement, complained of Roberts's erratic driving, and provided a license-plate number. When officers arrived at the scene, they were able to confirm the information provided by the anonymous tip. Moreover, when talking to Roberts at the hospital, Crain detected the faint smell of alcohol.

¶45. As the circuit court properly noted during the suppression hearing,

> Crain felt that it's obvious that there was an impaired driver, impaired to the point where you are driving erratically and in the wrong lane. A faint smell of alcohol would indicate that [alcohol] may be part of it, but . . . that [alcohol is] not all of it.

> The fact that [Crain] didn't mention what drug that might be, he couldn't know. That's why he asked that the blood be tested. And obviously, [Crain] [felt] like he [had] a severely impaired driver and only a faint smell of alcohol. [T]hat's . . . why he asked for the authority to search for alcohol and/or drugs present in [Roberts's] blood.

¶46. Although the municipal court judge did not recall a discussion regarding potential drug impairment, he acknowledged that Crain's affidavit specifically stated that blood and urine were needed to determine if Roberts was driving under the influence of drugs or alcohol. Moreover, the municipal court judge acknowledged that the warrant he read and

signed authorized drug and alcohol testing.

¶47.    Considering the totality of the circumstances, we find substantial evidence supports the municipal court judge's determination that probable cause existed.  As probable cause existed for the issuance of the search warrant, the circuit court did not err in denying Roberts's motion to suppress.

V.    *Prosecutorial Misconduct*

¶48.    Roberts last asserts the prosecutor committed prosecutorial misconduct during his rebuttal closing argument when he made the following statement:

> It ain't about nothing except you good people in Lauderdale County letting him know that you're not going to allow him to drive impaired on the highway and kill our children.

Although no objection was made in response to the statement, Roberts argues this was an improper "send a message" argument and asks this Court to find plain error.

¶49.    "The supreme court has condemned any prosecution suggestion that the jurors 'send a message' with a verdict." *Forbes v. State*, 771 So. 2d 942, 950 (¶25) (Miss. Ct. App. 2000).  To determine whether a "send a message" argument constitutes reversible error, we apply two threshold questions, followed by a two-pronged test, as outlined in *Spicer v. State*, 921 So. 2d 292, 318 (¶55) (Miss. 2006).  *O'Connor v. State*, 120 So. 3d 390, 399 (¶23) (Miss. 2013).

¶50.    The first threshold inquiry is whether defense counsel objected to the statement at issue.  *Id.*  While the failure to contemporaneously object generally waives a claim of prosecutorial misconduct during closing argument, "we will review such a claim if the

16

prosecutor's statement was so inflammatory that the [circuit] judge should have objected on his own motion." *Id*. at (¶26). For the second threshold inquiry, we must consider "whether, in light of the surrounding circumstances, defense counsel invited the statement." *Id*. at (¶24).

¶51. If the threshold inquiries are met, then the Court must proceed to the two-pronged test set forth in *Spicer* and determine "(1) whether the [prosecutor's] remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused's rights." *Id.* at (¶25) (quoting *Spicer*, 921 at 318 (¶55)).

¶52. Here, it is undisputed that no objection was made by defense counsel. Nevertheless, we do not find that the prosecutor's statement was so inflammatory that the circuit judge should have objected on his own motion. Moreover, the record shows defense counsel invited the statement.

¶53. During his closing argument, defense counsel stated as follows:

> This question is about whether or not Mitchell Roberts is criminally responsible for this death. This is not about race.[5] This is not about whether black lives matter in Meridian[,] Lauderdale County, Mississippi. They do. This is not about whether there's equal access to justice in Meridian[,] Lauderdale County, Mississippi[,] for African Americans as well as white folks. There is. The issue for y'all to decide is whether or not Mitchell Roberts was impaired by Xanax on that day.

In response, during his rebuttal closing argument, the prosecutor made the following statement:

> *It ain't about black/white.* It ain't about nothing except you good people in Lauderdale County letting him know that you're not going to allow him to

---

[5] Roberts is Caucasian; Altman Jr. was African American.

17

drive impaired on the highway and kill our children.

(Emphasis added to note the portion omitted by Roberts).

¶54. Based on the transcript, it appears Roberts has taken the prosecutor's comment out of context. "Given the latitude afforded an attorney during closing argument, any allegedly improper prosecutorial comment[s] must be considered in context, considering the circumstances of the case, when deciding on their propriety." *Ahmad v. State*, 603 So. 2d 843, 846 (Miss. 1992). Considering the context in which the comment was made and the circumstances of the case, we find the prosecutor's remarks were made in response to the defense counsel's comments on race.

¶55. Upon review, we find the prosecutor's statement was invited by defense counsel and was not so inflammatory that the circuit judge should have objected. As a result, the threshold inquiries for prosecutorial misconduct have not been met, and this issue is therefore waived. *See O'Connor*, 120 So. 3d at 400 (¶27).

¶56. Notwithstanding the waiver, we find the prosecutor's comments do not survive the two-part test of *Spicer*. A statement is not "improper simply because it sends a message that the community will not tolerate violence . . . ." *Spicer*, 921 So. 2d at 318 (¶55). Instead, a statement is improper if it "tend[s] to cajole or coerce a jury to reach a verdict for the purpose of meeting public favor and not based on the evidence." *Id*.

¶57. Here, defense counsel advised the jury that it must decide whether Roberts was impaired by Xanax and was therefore criminally responsible for Altman Jr.'s death. In response, the prosecutor advised that if the jury determined that Roberts drove impaired and

18

killed fourteen-year-old Altman Jr., he would face the consequences of his actions. Such comments did not urge the jury to reach a verdict based on emotion or public favor. Instead, the comments were based on the evidence presented at trial.

¶58. Additionally, Roberts's rights were not prejudicially affected by the prosecutor's remarks. Indeed, a review of the record shows that absent the prosecutor's comments during closing arguments, the jury would still have found Roberts guilty. *See Brown v. State*, 986 So. 2d 270, 276 (¶16) (Miss. 2008) (To meet the second prong of the *Spicer* test, it must be clear that absent the prosecutor's comments, the jury would have found the defendant guilty.). Accordingly, Roberts's claim of prosecutorial misconduct fails.

CONCLUSION

¶59. We find the judgment of the Lauderdale County Circuit Court of conviction of aggravated DUI and sentence of twenty-five years in the custody of the Mississippi Department of Corrections, with seven years suspended and eighteen years to serve, followed by five years' reporting postrelease supervision, a $2,000 fine, and $7,150 in restitution, should be affirmed.

¶60. **AFFIRMED.**

**LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR. TINDELL, J., NOT PARTICIPATING.**

19