# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-00564-COA

**DESMOND JAMAR PATTERSON A/K/A**        **APPELLANT**
**DESMUND PATTERSON**

**v.**

**STATE OF MISSISSIPPI**        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/03/2017 |
| TRIAL JUDGE: | HON. JAMES SETH ANDREW POUNDS |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM C. STENNETT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JASON L. DAVIS |
| | ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | J. TRENT KELLY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/31/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., CARLTON AND GREENLEE, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     An Alcorn County jury convicted Desmond Patterson of the attempted murder of

Kelin Edgeston.  The trial court sentenced Patterson to forty years in the custody of the

Mississippi Department of Corrections, with ten years suspended.  Patterson now appeals his

conviction and sentence, arguing that the jury verdict is against the overwhelming weight of

the evidence and that the trial court erred in allowing testimony regarding Patterson's

Facebook account into evidence.  Finding no error, we affirm the trial court's judgment.

**FACTS**

¶2. Patterson was indicted for the attempted murder[1] of Edgeston stemming from an April 15, 2016 altercation in Corinth, Mississippi. During the altercation, Patterson allegedly fired a gun in Edgeston's direction. Edgeston fled, and Patterson followed him. Patterson hit Edgeston in the back of the head with the gun and allegedly fired two additional shots, injuring Edgeston.

¶3. At a trial held February 27, 2017 through March 3, 2017, the jury heard testimony from Corinth Police Department officers who responded to the 911 call reporting the shooting. The jury also heard testimony from witnesses to the shooting, as well as testimony from the surgeon who treated Edgeston's injuries. Edgeston and Patterson both testified.

¶4. Edgeston testified that he had known Patterson for approximately a year and half prior to the shooting. According to Edgeston, the two men started out as friends, but then "things went . . . sour." Edgeston explained that he and Patterson had disagreements regarding their work at Sonic, and they both were eventually fired. Edgeston testified that after he and Patterson were fired, his situation with Patterson escalated—Patterson began threatening to kill him and even pulled a gun on him. Edgeston also testified about two incidents that occurred prior to the shooting: one when Patterson saw Edgeston drive past him and Patterson fired a gunshot in the air, and another one at a child's birthday party where Patterson pulled a gun on Edgeston, held it to his face, and threatened to kill him. Edgeston also testified that he reported Patterson's threats to a police officer.

¶5. Regarding the events surrounding the shooting, Edgeston testified that on the

_____

[1] Patterson was indicted for attempted murder pursuant to Mississippi Code Annotated section 97-1-7 (Rev. 2014).

afternoon of April 15, 2016, he was visiting with a friend about some CDs. Edgeston saw Patterson walking toward him with a gun, and Patterson started firing at Edgeston. Edgeston testified that Patterson pointed the gun "directly" at him, and Edgeston ran to get away from Patterson. Edgeston stated that he spotted a car across the street with the door open, so he ran to the car for cover. Edgeston got on his knees behind the car door and asked Patterson why he was shooting at him. Edgeston stated that Patterson then "smacked [him] in the back of the head" and the gun went off, firing a shot. Patterson then stood over Edgeston while Edgeston "begged for [his] life." Edgeston testified that while he was on the ground, Patterson then fired another shot toward his head. Edgeston testified that during the incident, he was unarmed. He further testified that he did not even own a gun.

¶6. Tyesha Gunn, Patterson's cousin,[2] testified that around 3 p.m. on April 15, 2016, she and her sister, Zharia Cobbs, and their friends Latonya Holland and a man named Evoris, were driving around town. Gunn saw Patterson walking toward "the projects." Patterson flagged Gunn down and asked to ride with her. Patterson entered the vehicle and said "drive and then I'll let you know when I'll get out." Gunn testified that she could tell that Patterson was drunk. Gunn stated that she let Patterson out of the vehicle "close to the projects on Mitchell Street." She observed Patterson pull out a gun and walk toward a house. Gunn testified that she did not know that Patterson had a gun with him until she saw him pull it out after he exited her vehicle. Gunn testified that she also saw Edgeston on the street. Accordingly to Gunn, Patterson fired multiple gunshots in Edgeston's direction. Gunn

---

[2] Gunn also stated that Edgeston is married to her cousin.

3

explained, however, that although Patterson fired the shots toward Edgeston, he did not aim "like he was trying to shoot him"; rather, like he was trying to get Edgeston's attention. Gunn testified that Edgeston looked scared and started running. Gunn testified that Cobbs and Holland tried to stop Patterson and pull him back into the vehicle, but they were unsuccessful.

¶7. Gunn testified that Edgeston ran and hid next to a car, and then he got down on his knees on the ground. Gunn stated that she did not ever see Edgeston with a gun. Gunn recounted that Patterson then stood over Edgeston and "shot him a couple of times." Gunn later explained that although she heard the gunshots and saw Patterson standing over Edgeston, she did not actually see Patterson shoot Edgeston. Gunn also stated that she did not witness Patterson strike Edgeston with the gun.

¶8. Officer Timothy Boggs testified that on April 15, 2016, he was working for the Corinth Police Department and received a radio call regarding a shooting on Mitchell Street. Boggs responded to the call and was the first police officer on the scene. Officer Boggs testified that when he arrived at the scene of the shooting, he observed a man helping a second man get inside of a vehicle. Boggs described the second man as "bloody from head to toe," and he observed that the second man appeared to be bleeding from his head. Officer Boggs approached the two men to find out what happened. The first man told him "I've got to take [the second man] to the hospital. I've got to get him to the hospital." Officer Boggs called his dispatcher, reported the tag number of the vehicle carrying the bloody man, and informed the dispatcher that the vehicle was heading to the hospital. Officer Boggs testified

4

that he next secured the crime scene. At the scene, he observed blood on the ground, along with a cup and a magazine from a gun.

¶9. Detective Jerry Rogers of the Corinth Police Department also responded to the call about the shooting. Detective Rogers testified that by the time he arrived, Officer Boggs had already secured the area and taped off the crime scene. Detective Rogers testified that he observed blood on the driveway and a magazine from a handgun, as well as a .40 caliber live round on the driveway.

¶10. Investigator Heather Russell of the Corinth Police Department testified that she interviewed approximately five witnesses at the crime scene, including Cotanga Franklin, who witnessed the entire event. The witnesses informed Investigator Russell that they heard multiple gunshots, and they identified Patterson as the shooter. Investigator Russell also interviewed Edgeston in the hospital, and he identified Patterson as the person who shot him.

¶11. Investigator Russell also interviewed Patterson. Investigator Russell testified that Patterson denied shooting Edgeston, but he admitted to possessing a gun and striking Edgeston in the head with the gun. Investigator Russell stated at trial that Edgeston's medical records showed that Edgeston was hit in the back of the head with a gun and that two bullets grazed his head. According to Investigator Russell, Patterson also informed her where he had stored the gun used in the altercation, and officers were able to recover it. During cross-examination, Investigator Russell testified that Patterson told her that he purchased the gun for protection "from the beef that he and [Edgeston] had had with one another."

5

¶12. Investigator Russell also testified that during her interview with Patterson, he pulled up his Facebook account on a computer and showed it to her. Investigator Russell then obtained a search warrant for Patterson's Facebook account. After obtaining the search warrant, Investigator Russell went to Facebook's law enforcement portal, verified that she was a certified law enforcement officer, and also verified that she was making an official request for records. Investigator Russell then received access to Patterson's account, including his messages. At trial, the State entered Facebook messages sent by Patterson into evidence, without objection by the defense. In all of the messages presented at trial, Patterson admitted to wanting to kill Edgeston, and he detailed the events surrounding the shooting.

¶13. Cotanga Franklin testified that she lived in a house on Mitchell Street during April 2016. Franklin testified that around 3 p.m. on April 15, 2016, she heard two gunshots. Franklin stated that she then looked out of her door and "noticed [Patterson] walking down the street with a gun in his hand." Franklin testified that Patterson pointed the gun "across the street where [Edgeston] was [standing]." According to Franklin, Patterson fired the gun again in Edgeston's direction as he approached. Edgeston then "got on his knees" with Patterson standing over him. Edgeston called out "Please don't shoot me. No, [Patterson], please don't shoot me." Patterson "swung the pistol and hit [Edgeston] in the head," and the gun fired. Franklin testified that it looked like Patterson "was struggling with the gun," and then he pointed it at Edgeston again and "fired it directly at him." At that point, Franklin went to wrap her shirt around Edgeston's head to stop the bleeding. Patterson left the scene,

and Franklin testified that "[h]e just looked like he had frustration in his eyes."

¶14.   Franklin also testified about an incident a week prior to the shooting, where she and several other neighbors witnessed Patterson get in Edgeston's face, put a gun to Edgeston's head, and ask him "what was that [Edgeston] was talking [about]."  Franklin testified that Patterson informed Edgeston, "I'll shoot you, I'll kill you. . . . I'll kill you and your kids."  Edgeston did not have a gun, and he held up his hands while Patterson held the gun to his head.  Edgeston also informed Franklin that Patterson had "shot [his gun] in the air behind him."

¶15.   Dr. Andy Holley, the State's expert witness in the field of general surgery and trauma care, was working at Magnolia Regional Health Center on April 15, 2016, and provided treatment for Edgeston.  Dr. Holley testified that Edgeston's two wounds on the top of his head were consistent with gunshot wounds.  Dr. Holley also testified that Edgeston's wound on the back of his head was consistent with trauma, whether a fall or blunt force from a strike.

¶16.   Latonya Holland, Patterson's cousin, testified for the defense.  Holland stated that on the afternoon of April 15, 2016, she, Gunn, Cobbs, and another man were driving around Corinth and spotted Patterson.  Patterson waved them down, and he got inside of the car with them.  Holland testified that they eventually dropped Patterson off at a street "coming into the projects."  Patterson started walking down the street.  Cobbs exited the vehicle and ran down the street after Patterson, calling out to him and asking him to come back.  Holland testified that she ran after Patterson and Cobbs.  Holland stated that she saw Patterson

approaching Edgeston, and she did not realize Patterson had a gun until he pulled it out and started firing it "directly at [Edgeston]." Holland observed Edgeston run behind a car to hide. Patterson then hit Edgeston on the head with the gun, and the gun went off, firing a shot.

¶17. Patterson testified in his own defense. According to Patterson, he and Edgeston worked together at Sonic. Their relationship started out friendly, but disagreements at work led to the two men getting fired. Patterson testified that after they were fired, he heard Edgeston drive his car past Patterson's house "trying to make loud noises with the tires." Patterson testified that on another occasion, Edgeston drove by Patterson's house, stopped his car, squealed his tires, and fired gunshots in the air. Patterson testified that he had several other interactions with Edgeston where Edgeston possessed a gun. Patterson stated that as a result of these interactions, he purchased a gun for protection from Edgeston.

¶18. The jury returned a guilty verdict, and on March 3, 2017, the trial court sentenced Patterson to forty years in the custody of the MDOC, with ten years suspended. The trial court also sentenced Patterson to five years of postrelease supervision upon his release, and ordered him to pay $431.50 in court costs, a $1,000 fine, $200 to the Corinth Police Department's investigative fund, $125 to Magnolia Surgical Group, $423 to Magnolia Imaging Center, $660 to Magnolia Physicians Services, and $8,539.50 to Magnolia Hospital.

¶19. After Patterson was convicted and sentenced, Patterson's trial counsel filed a motion requesting to withdraw and asking the trial court to appoint Patterson with counsel on appeal. The trial court entered an order appointing the Indigent Appeals Division of the Office of State Public Defender to represent Patterson and allowed Patterson time to file an out-of-time

appeal.

¶20.    On April 28, 2017, Patterson filed his notice appealing his conviction and sentence, as well as the denial of his posttrial motions.  However, the record reflects that Patterson failed to file any posttrial motions.  On September 20, 2017, Patterson's counsel from Indigent Appeals filed a motion to withdraw and substitute counsel.  This Court entered an order granting that motion on September 28, 2017.  Patterson's current appellate counsel subsequently entered his notice of appearance in the case.

## DISCUSSION

### I.    Weight and Sufficiency of the Evidence

¶21.    Patterson first argues that the jury's verdict finding him guilty of attempted murder is against the overwhelming weight of the evidence presented at trial.  In his brief, Patterson also appears to challenge the sufficiency of the evidence.  We will therefore address both standards.

¶22.    "When reviewing a challenge to the weight of the evidence, the Court will disturb a jury verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Jones v. State*, 154 So. 3d 872, 880 (¶24) (Miss. 2014) (internal quotation mark omitted).  We review the evidence in the light most favorable to the verdict.  *Roberts v. State*, 229 So. 3d 1060, 1068 (¶29) (Miss. Ct. App. 2017).

¶23.    When testing the sufficiency of the evidence on appeal, we apply a de novo standard of review.  *Brooks v. State*, 203 So. 3d 1134, 1137 (¶11) (Miss. 2016).  "The relevant

9

question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008) (citation omitted). We also view the evidence in the light most favorable to the State. *Henley v. State*, 136 So. 3d 413, 415 (¶8) (Miss. 2014).

¶24. As a procedural matter, we must first address whether Patterson's claims are properly before us on appeal. After the State rested its case-in-chief, defense counsel moved for a directed verdict, arguing that the State failed to meet its burden of proof. Defense counsel explained that although the State presented testimony from its witnesses and also Patterson's Facebook messages, the State presented very little physical evidence to prove that Patterson was guilty of attempted murder. The trial court denied the defense's motion, ruling as follows:

> Looking at the evidence most favorable to the nonmoving party, the [c]ourt is of the opinion the State has made a prima facie case of attempted murder. The evidence is such that the [c]ourt finds the State's made an overwhelming case of attempted murder as far as the charge going forward and will be a question of fact to be presented to the [j]ury.

¶25. The record shows that Patterson failed to renew his motion for a directed verdict at the close of the evidence. We recognize that

> [w]hen the defendant proceeds with his case after the [S]tate rests and the court overrules the defendant's motion for a directed verdict, the defendant waives the appeal of the denial of his motion for a directed verdict unless he renews his motion for a directed verdict at the conclusion of all of the evidence.

*Darnell v. State*, 202 So. 3d 281, 285 (¶13) (Miss. Ct. App. 2016) (quoting *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995)) (internal quotation mark omitted). "In the absence of

a renewal of the directed-verdict motion, a request for a peremptory instruction, or a motion for a [judgment notwithstanding the verdict], an appellant has waived the sufficiency error on appeal." *Id*. The record shows that Patterson also failed to request a peremptory instruction or file posttrial motions. Patterson is therefore barred from challenging the sufficiency of the evidence on appeal.

¶26. Additionally, the record reflects that Patterson failed to file a motion for a new trial. As a result, Patterson is also barred from challenging the weight of the evidence on appeal. *Id*. at (¶14).

¶27. Procedural bar notwithstanding, our review of the record shows that the State presented sufficient evidence at trial to support the jury's verdict of guilty. This issue lacks merit.

## II. Admission of Facebook Messages into Evidence

¶28. Patterson next claims that the trial court committed plain error by allowing testimony regarding Patterson's Facebook entries to be entered into evidence at trial. Patterson states that he testified at trial that his Facebook messages were not true and that he only wrote them in order to "look good." Patterson asserts that the prejudicial value of the untrue statements made in his Facebook messages outweighs the probative value, and therefore the trial court's admission of the Facebook messages amounted to plain error.

¶29. The record reflects that during its preliminary instructions to the jury, the trial court explained that the State and the defense had agreed upon various exhibits that would be entered into evidence, including records from Patterson's Facebook account. The record

11

reflects no objection by the defense to the admission of the records from Patterson's account, including his Facebook messages, at any point prior to or during the trial. The record also reflects no objection by the defense to Investigator Russell's testimony regarding Patterson's Facebook messages.

¶30. We review a trial court's admission of evidence for an abuse of discretion. *Debrow v. State*, 972 So. 2d 550, 552 (¶6) (Miss. 2007). However, when a defendant fails to make a contemporaneous objection to the introduction of evidence at trial, he waives that assignment of error on appeal. *Johnson v. State*, 904 So. 2d 162, 170 (¶23) (Miss. 2005). The defendant must then "rely on plain error to raise the assignment on appeal." *Id*. Since Patterson failed to make a contemporaneous objection to Investigator Russell's testimony regarding his Facebook messages or the trial court's admission of Patterson's Facebook account into evidence, we will review this issue for plain error. We recognize that "[a]n error is deemed plain error when the substantive rights of a defendant are affected." *Id*. (internal quotation marks omitted). The supreme court has held that "in order to determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether the error has prejudiced the outcome of the trial." *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016) (internal quotation mark omitted).

¶31. At trial, Investigator Russell testified that during her investigation into the shooting, she was informed that Patterson had posted a message through his Facebook account two days prior to the shooting and tagged Edgeston in the post. Investigator Russell testified that

she logged on to Facebook, pulled up Patterson's account, and read the post. The State entered the post into evidence, and Investigator Russell read the post to the jury:

> [Edgeston,] I thought I let [you] . . . know but I see u still out here running my name like a . . . bitch . . . I see [I'm gonna] have to touch your for u to really find out who the fuck u playin[g.] No more talk[,] see me bitch . . . and for everybody [who] see[s] this and [Edgeston] act like he don't see please let him know what[']s up[, I] ain't got no time to be playin[g,] [I'm gonna] get this shit over wit[h].

¶32. According to Investigator Russell, Edgeston responded to Patterson's post, writing as follows:

> I'm a family man. Drama not needed. My kids and the one on the way [are going to] have the[ir] daddy around to look up to with no worries. This black on black ignorant shit [is] for the birds. You see where it got us both, jobless for this ignorance, knock[ed] down once again. I ain[']t fucking with you so why [are] you fuck[ing] wit[h] me. Be the bigger man. [L]ord knows I[']m tryin[g].

¶33. Investigator Russell testified that when she interviewed Patterson, she asked him about his Facebook post. Investigator Russell stated that Patterson then accessed his Facebook account and showed it to her. Investigator Russell testified that after interviewing Patterson, she obtained a search warrant for Patterson's Facebook account. She then requested the records of Patterson's account through Facebook's law enforcement portal. Investigator Russell confirmed that the records had been attested to by the custodian of the records at Facebook as being a true and accurate document of Patterson's account.[3]

¶34. The State introduced several conversations between Patterson and his friends, sent via Patterson's Facebook account. Investigator Russell testified that prior to the April 15, 2016

---

[3] Our review of the record reflects no issue regarding the authentication of Patterson's Facebook account. *See Boyd v. State*, 175 So. 3d 1, 4-5 (¶¶14-16) (Miss. 2015).

shooting, Patterson sent a Facebook message to someone threatening to "shoot [Edgeston's] car up." Investigator Russell also testified that in a message sent by Patterson the day after the shooting, he told a friend, "I shot a [man] yesterday."

¶35.    Investigator Russell testified as to another message Patterson sent the day after the shooting where he explained that before the shooting, Edgeston "put a gun in my face wit[h] my son in the car and go say [f]uck yo son I'll shoot him too[.] I told [Edgeston] just like this u let me pull off without pullin[g] that trigger I'm killing u and I meant that[.]" In the message, Patterson stated that on the day of the shooting, he saw Edgeston. Edgeston called out a profanity to Patterson, so Patterson "turn[ed] up and started dumping at [Edgeston. H]e ran and fell by the car and I smacked him wit[h] the pistol and he started [r]ollin[g] for what reason[.]" Patterson then admitted "I shot that bitch in the head[.]" Investigator Russell testified that she believed the phrase "started dumping" meant that Patterson fired multiple rounds at Edgeston.

¶36.    The State entered in additional Facebook messages between Patterson and his friends, and in all of these messages, Patterson admitted that he shot Edgeston and had been threatening to do so for weeks, and also provided details about the crime.

¶37.    At trial, Patterson denied trying to shoot Edgeston or attempting to murder him. When asked by defense counsel why he sent Facebook messages stating otherwise, Patterson responded "I don't know. I was just . . . upset and I was just talking . . . [and] trying to make myself look good[.]"

¶38.    Upon review, we find no plain error in the trial court's admission of Patterson's

14

Facebook records into evidence or Investigator Russell's testimony regarding Patterson's Facebook messages. Patterson was afforded the opportunity to testify in his own defense at trial. During his testimony, Patterson denied the veracity of the messages. *See Clark v. State*, 122 So. 3d 129, 134 (¶16) (Miss. Ct. App. 2013). Jurors are tasked with evaluating the credibility of the witnesses at trial, and in so doing, "jurors are allowed latitude in deriving facts from each witness's assertions[] and . . . must determine the value of the conflicting testimony introduced during the trial." *Flowers v. State*, 144 So. 3d 188, 196 (¶26) (Miss. Ct. App. 2014). This issue lacks merit.

¶39. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**