# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01237-COA

**LATOYA BRISCO A/K/A LATOYA NICOLE**                 **APPELLANT**
**BRISCO A/K/A TOYA**

**v.**

**STATE OF MISSISSIPPI**                                           **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/31/2017 |
| TRIAL JUDGE: | HON. M. JAMES CHANEY JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHN R. REEVES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALICIA MARIE AINSWORTH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/01/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT**:

¶1. On November 18, 2013, Latoya Brisco stabbed and killed Carl Whitaker. She was indicted for murder, and on February 23, 2017, a Warren County jury found her guilty of culpable negligence manslaughter. She was sentenced to twenty years in prison with ten years to serve and the remaining years suspended with post-release supervision. After the denial of her post-trial motions, Brisco appealed her conviction. Finding no error by the circuit court, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Brisco and Whitaker had been platonic friends for four years prior to Whitaker's

death. Brisco lived with her domestic partner, Casheka Northern. When they would have disagreements, Brisco would stay at Whitaker's—on one occasion, for over a month.

¶3. Over the years, Brisco and Whitaker also had arguments, especially when Whitaker was drinking. Whitaker apparently desired a closer relationship than Brisco wanted, and he became upset when she became pregnant by someone else. In April 2013, Whitaker allegedly called Brisco and left messages on her voice mail threatening to kill her and her baby. Whitaker had told Brisco that he had served time for stabbing a man in 2000. Fearing him this time, Brisco filed charges against Whitaker in justice court, but there was no hearing on the charges prior to his death. Despite this, Brisco testified that Whitaker apologized, and that they resumed their friendship.

¶4. Things ended differently on the night of November 18, 2013. Early in the evening, Whitaker called Brisco and offered to buy some tequila and come over to socialize with Brisco and Northern. At that time, Brisco's baby had been born and was three months old. Also living with Brisco were Northern's two minor children, K.N. and Z.N.[1] K.N. was fourteen at the time; Z.N. was twelve. That night, Northern was also keeping her baby nephew, K.Y., while his mother worked.

¶5. Brisco picked Whitaker up and drove him to a liquor store where he purchased the alcohol. They returned to Brisco's home where Whitaker and Northern started drinking; Brisco did not drink with them. Both Brisco and Northern testified that no drugs were used, but several times that evening Whitaker went outside to smoke. Whitaker and Northern

---

[1] To protect the privacy of the minor children, only their initials will be used.

became intoxicated—Northern so much so that she passed out in the bedroom where Brisco's baby was asleep.

¶6.     Around 8 p.m., Brisco and Whitaker were playing checkers for money while the older children were watching television. During their conversation, Brisco asked Whitaker for the $55 he owed her for a part he had broken on her car. They began arguing, and Brisco said she would let him slide with paying $30. What happened after this is in dispute.

¶7.     According to K.N., Whitaker and Brisco argued for some time. Whitaker asked Brisco to take him home, and she refused. Both K.N. and Z.N. testified that Brisco pulled the computer chair in front of the door and prevented Whitaker from leaving. According to K.N. and Z.N., Whitaker stood up and, being intoxicated, fell against the wall. He became angry and called 911. He told the 911 dispatcher that the people he was with would not let him leave. Both minor children testified that during the call, which lasted over ten minutes, Brisco continued to sit in the chair blocking the front door and laughing. According to K.N., Brisco said, "You're not going nowhere until you give me my $55." At one point, the 911 call dropped, and 911 called Whitaker back. Whitaker told the 911 dispatcher that he had been stabbed. But both children testified that Whitaker had not been stabbed at the time of his 911 call, although both he and Brisco had knives,[2] and Brisco made some threatening gestures toward Whitaker during the call. Z.N. testified that she left the room shortly after

_____

[2] Whitaker had a pocket knife; Brisco had a larger kitchen knife that was kept on a plant stand by the front door and used to somehow secure the door.

3

Whitaker's 911 calls.[3]

¶8.    K.N. remained in the living room throughout the rest of the incident. She testified that after the 911 call, Whitaker came around the couch and asked Brisco, who was sitting in the chair in front of the door, to let him leave. Brisco refused. Whitaker became angrier and threw a bassinet towards K.N. and came at Brisco. Brisco stood to meet Whitaker, holding the knife she had picked up. Brisco and Whitaker went to the floor. At this point, K.N. ran to the kitchen and returned with a steak knife. K.N. stabbed Whitaker once in the back; he got to his feet, and, according to K.N., he was swinging his knife really fast. K.N. stabbed Whitaker a second time. When Whitaker fell to the floor, K.N. saw that he had Brisco's knife in his neck.

¶9.    Contradicting K.N. and Z.N., Brisco testified that she never prevented Whitaker from leaving. According to her, Whitaker, not she, was at the front door when he made the 911 call, and he could have left at any time. He was angry and threw the bassinet at K.N. Brisco said Whitaker then came toward her and wrestled her to the floor while trying to cut her with his knife. When K.N. stabbed Whitaker in the back, he turned, and Brisco was able to get up. Whitaker was swinging his knife and acting in a crazy manner that Brisco said she had not seen before. Brisco struck out with her knife and said she did not know that she had stabbed him in the neck. Brisco testified she did this to protect herself and her household. She also testified that she had no intention of killing Whitaker. Brisco herself suffered cuts

---

[3] In her statement to the police that night, Z.N. said she witnessed the entire incident. However, at trial, she testified that when they were waiting in the station, Brisco told her what to say. She followed Brisco's instruction and told police she was present when Whitaker died, but at trial she clearly stated that she had left the room prior to the stabbing.

and a scratch on her back, but she needed no medical attention.

¶10.    Brisco called 911, but because Whitaker had called earlier, Deputy Sheriff Chris Satcher had already arrived and was outside the home waiting on back up when the lights in the house came on and he heard a commotion.  As he entered, he saw Whitaker falling to the floor and bleeding profusely.  Other law enforcement entered, and Satcher attended to the dying Whitaker.  Satcher was unable to help him given the severity and location of the wound, and within a minute, Whitaker died.  Satcher took photos of the area, as well as of a scratch on K.N.'s leg, a cut on Brisco's pinky finger, and a deep scratch on Brisco's back.

¶11.    Brisco and the children were taken to the police station to give their statements. Whitaker's body was taken by the medical examiner for an autopsy and toxicology testing. The test results revealed that Whitaker's blood alcohol level was .207 (.08 being the legal limit for driving a car).  In addition, he had marijuana and cocaine in his blood, which suggested recent use.  At trial, the medical examiner testified that the combination of cocaine and alcohol increases aggression.

¶12.    Initially, no arrests were made.  Law enforcement thought the case was one of self-defense because they had been told that someone was in the home with a knife threatening to kill everyone.  However, Satcher requested the 911 calls.  After reviewing them, Satcher concluded that further investigation was needed, which resulted in Brisco's indictment for murder on July 31, 2014.

¶13.    Pre-trial, Brisco filed three motions in limine: (1) to limit Satcher's testimony concerning the 911 calls; (2) to admit the threatening voice messages that Whitaker left

Brisco in April 2013; and (3) to enter Whitaker's 2000 indictment and conviction. Concerning Satcher's testimony, Brisco objected to his interpretation of the intelligible parts of the 911 calls. The court agreed and limited Satcher to testifying only that he launched a murder investigation based on the 911 calls. With respect to Whitaker's voice messages, the court denied Brisco's motion because the dates of the messages were undocumented and she testified they even preceded April 2013—thus, being too remote in time to prove Brisco's state of mind during the November incident. The court reserved ruling on the admission of Whitaker's conviction, but during trial, the court did admit it.

¶14. At trial, the State called K.N. and Z.N. to testify about the incident. Chuck Tate, the director of the 911 call center, testified about the 911 calls. Satcher testified about law enforcement's investigations, and the coroner and a forensic pathologist from the medical examiner's office testified about their examination of Whitaker's body and their opinions concerning his cause of death. Evidence from the crime scene included photographs of the living room. The State pointed out that the blood stains contradicted Brisco's story that Whitaker was at the front door during the 911 call and then charged at her, because blood splatters were found on the front door along with a pool of blood; blood then trailed across the room to where Whitaker ultimately fell. This, the State argued, showed that Brisco was blocking the front door when Whitaker approached her and that is where he was stabbed. He then staggered away and fell further into the room.

¶15. The jury also listened to the 911 calls—two from Whitaker and one from K.N. and Brisco after the stabbing. According to the records, the first 911 call from Whitaker came

in at 8:18 p.m. and lasted fifteen minutes. Brisco's call after the stabbing was documented at 8:36 p.m.

¶16. After the State rested, Brisco moved for a directed verdict, which the court denied. The only witness for the defense was Brisco.

¶17. After being instructed by the court, the jury deliberated. Three hours into its deliberations, the jury sent out a question:

> Do either of these meet the criteria for culpable negligence— 1. the fact that she brought a man who she knew to be aggressive under the influence of alcohol, and against whom she had previously filed charges for assault, setting up conditions leading to his death, constitute culpable negligence? 2. By not permitting Carl to leave when he wanted to, thus setting up conditions leading to his death, constitute culpable negligence?

After conferring with counsel and without objection, the court responded: "The jury must decide the case based on the instructions already given to you." An hour later, the jury sent another question: "What is feloniously? What does not in necessary self[-]defense [mean]?" The court and counsel reviewed the definition of "feloniously" in Black's Law Dictionary and compared the jury instruction given with the Plain Language Model Jury Instructions. Defense counsel suggested an answer, saying that feloniously meant "deliberate intent to commit a crime" and that self-defense is defined in the instructions already given by the court. The court responded to the jury, saying: "The jury must decide the case based on the instructions already given." A third time the jury sent out a question: "What does felonious mean??? definition please." The court and counsel conferred and with no objection from Brisco, the court responded: "With the intent to commit a crime."

¶18. The jury ultimately found Brisco guilty of culpable negligence manslaughter. Brisco's

7

attorney filed a motion for a judgment notwithstanding the verdict or a new trial on March 23, 2017. Brisco then secured new counsel who filed an amended motion on August 1, 2018. The State moved to dismiss the amended motion. The court denied both the State's motion to dismiss and Brisco's amended motion on August 15, 2018. Brisco filed a notice of appeal on August 28, 2018. In her brief, she stated the issues as:

I.      Whether the court erred in failing to admit Whitaker's voice messages.

II.     Whether the court erred in its responses to the jury's questions.

III.    Whether the court erred in failing to grant Brisco's motion for a directed verdict.

IV.    Whether the court erroneously overruled Brisco's objections to certain testimony and evidence at trial.

V.     Whether the verdict was against the overwhelming weight of the evidence.

VI.    Whether the court erred in allowing the State to argue to the jury what was said on Whitaker's 911 calls.

VII.   Whether the court erred in granting instruction S-5A.

VIII.  Whether Brisco was provided ineffective counsel.

## DISCUSSION

### I.      Whether the court erred in excluding Whitaker's voice messages.

¶19.    Brisco argues that the court erroneously excluded Whitaker's voice messages. We do not agree. We review the admission or exclusion of evidence for an abuse of discretion. *Young v. Guild*, 7 So. 3d 251, 262 (¶34) (Miss. 2009). Evidence is admissible if it is "relevant," meaning evidence having a tendency to make the existence of a fact of

8

consequence to the determination of the action more probable or less probable than it would be without the evidence. M.R.E. 401; *Newell v. State*, 175 So. 3d 1260, 1275 (¶32) (Miss. 2015). However, evidence that is remote in time or is otherwise far removed from an issue at trial is not relevant under Rule 401 and may be excluded by the trial court in the exercise of discretion. *Tillis v. State*, 661 So. 2d 1139, 1142-43 (Miss. 1995).

¶20. In this case, a large portion of the voice mail recording is unintelligible, and it is obvious that Whitaker had been drinking. Often he would curse Brisco and then call back to apologize. There is nothing in the content of the messages that would identify the date they were made. Brisco had her father download the messages to his computer, but again, there was no identifying dates. Brisco no longer had the original phone on which she had recorded them. Brisco could authenticate Whitaker's voice and testified that she had saved the messages pursuant to the sheriff's instruction when she filed justice court charges against Whitaker in April 2013 and thereafter. However, the circuit court excluded them primarily because it felt that they were too remote in time to prove Brisco's state of mind during the November 2013 stabbing.

¶21. Whether a threat is too remote is a question addressed to the sound discretion of the trial judge. *Steed v. State*, 396 So. 2d 625, 627 (Miss. 1981). There must be evidence of a causal relationship between the threat and the purpose for which it is offered. *Tillis*, 661 So. 2d at 1143. In *Myers v. State*, 147 So. 308, 309-10 (Miss. 1933), the supreme court held that the trial court did not abuse its discretion in excluding testimony of the threat given eight to nine months before a murder because there was no evidence that the threat by the deceased

9

and the ultimate homicide were connected. But in *Parr v. State*, 362 So. 2d 634, 636 (Miss. 1978), the Court affirmed the admission of threats made thirteen months before the killing because the record indicated that before and after the threats, there was continuing hostility, bitterness, and ill will between the parties.

¶22. We find no error by the court in excluding Whitaker's voice messages in this case. The court was correct in finding them too remote in time to the killing to show that Brisco still feared Whitaker, especially because Brisco and Whitaker had frequent amicable contacts with each other after the voice messages. Brisco had even invited Whitaker to her home that night to drink when she knew he could become belligerent if he became drunk. Therefore, the court was correct in ruling that Whitaker's voice messages in April were not probative of Brisco's state of mind when she stabbed him in November and not admissible.

**II.  Whether the court erred in its responses to the jury's questions.**

¶23. Brisco argues that the court erred in its responses to the questions sent out by the jury during its deliberations. But the record is clear that the court conferred with both the State and defense counsel before responding to the jury's questions, and at no point did Brisco's counsel object to the responses given. The failure to object at trial waives any assignment of error on appeal absent plain error. *Ross v. State*, 16 So. 3d 47, 57 (¶21) (Miss. Ct. App. 2009). Therefore, we find that this issue is procedurally barred on appeal. Nor do we find any plain error in the court's responses to the jury's questions. The plain-error rule is only applied when a defendant's substantive or fundamental rights are affected. *Foster v. State*, 148 So. 3d 1012, 1018 (¶20) (Miss. 2014). In such an analysis, we must determine whether

10

"the trial court has deviated from a legal rule[;] whether that error is plain, clear, or obvious[;] and whether the error has prejudiced the outcome of the trial." *Id.* Although Brisco has not argued plain error, we find no deviation by the court from any legal rule that would serve as the foundation for such an argument. Therefore, because there was no plain error, by failing to object to the court's responses to the jury's questions, Brisco has waived this issue on appeal.

¶24. Notwithstanding the procedural bar, we find no error in the court's responses. Rule 3.10 of the Uniform Rules of Circuit and County Court Practice, in effect at the time of trial, provided:

> If the jury, after they retire for deliberation, desires to be informed of any point of law, the court shall instruct the jury to reduce its question to writing and the court in its discretion, after affording the parties an opportunity to state their objections or assent, may grant additional written instructions in response to the jury's request.

We review a court's additional written instructions in response to a question from the jury for an abuse of discretion. *Willie v. State*, 204 So. 3d 1268, 1276 (¶23) (Miss. 2016). "Unless the trial judge based his response to the note on an incorrect interpretation of the law, we may not reverse for an abuse of discretion unless the trial court's handling of the matter was arbitrary and clearly erroneous." *Id.* Here, the court was cautious and sought the input of both the State and Brisco before responding to the jury's questions. It also consulted secondary authorities for guidance. We find no abuse of the court's discretion in how it handled this matter.

      **III.    Whether the court erred in failing to grant Brisco's motion for a directed verdict.**

11

¶25. We find Brisco's contention that the court erroneously denied her motion for a directed verdict meritless. Motions for a directed verdict challenge the legal sufficiency of the evidence. *Moss v. State*, 190 So. 3d 9, 13 (¶12) (Miss. Ct. App. 2015). All evidence introduced by the State, together with any reasonable inferences that may be drawn therefrom, is accepted as true. *Davis v. State*, 530 So. 2d 694, 703 (Miss. 1988). "Reversal of the trial court's ruling can occur only when, after viewing all the evidence in the light most favorable to the verdict, one or more of the elements of the charged offense is such that reasonable and fair-minded jurors could only find the accused not guilty." *Moss*, 190 So. 2d at 13-14 (¶12) (internal quotation marks omitted). The State bears the burden to prove beyond a reasonable doubt that the defendant committed the offense and did not act in self-defense. *Franklin v. State*, 72 So. 3d 1129, 1136 (¶29) (Miss. Ct. App. 2011) (citing *McIntosh v. State*, 749 So. 2d 1235, 1240 (¶17) (Miss. Ct. App. 1999)). "All credible evidence supporting the defendant's guilt will be accepted as true." *Brown v. State*, 176 So. 3d 1, 12 (¶33) (Miss. 2015).

¶26. Brisco argues that the State failed to prove that she did not act in self-defense. Brisco cites evidence from the record that would show she was acting to defend herself and her family (i.e., that Whitaker had lied to the 911 dispatcher about being stabbed and that there were men in the room; that Whitaker was drunk and drugged; that he had a knife and slung the bassinet at K.N.; and that even K.N. feared that Whitaker was killing Brisco, causing her to stab him in the back herself). The State argues that it presented sufficient evidence to contradict Brisco's account: both children present testified that Brisco had blocked the front

12

door and would not let Whitaker leave the home; in his 911 call, Whitaker said Brisco would not let him leave; if Brisco were in fear for her life, she would have let him leave; and the blood splatters on the door indicate that Brisco was at the front door when Whitaker came at her, and Brisco stabbed him. Whether Brisco acted in self-defense was a question for the jury to resolve. *Moss*, 190 So. 3d at 14 (¶13). Viewing the evidence in the light most favorable to the State, we find that the record reflects sufficient evidence from which a competent jury could find beyond a reasonable doubt that Brisco was not acting in self-defense but committed culpable negligence manslaughter. Thus, the court did not err in denying Brisco's motion for a directed verdict.

### IV. Whether the court erroneously overruled Brisco's objections to certain testimony and evidence at trial.

¶27. During the trial, Brisco's counsel objected to the admission of evidence and certain questions during testimony. She argues that the court's denials of her objections constitute reversible error. "We review a trial court's admission of evidence for an abuse of discretion." *Patterson v. State*, 270 So. 3d 87, 94 (¶30) (Miss. Ct. App. 2018). Despite Brisco's numerous claims, we find no error by the trial court in its rulings.

#### A. Objections to Chuck Tate's redirect

¶28. Brisco argues that the court erred in overruling her objection to testimony from Chuck Tate, the director of the Vicksburg-Warren County 911 office, concerning the time of Whitaker's 911 calls. We find no merit to this objection.

¶29. On direct examination, Tate testified that the call from Whitaker came in at 8 or 8:13 p.m. On cross-examination, Tate deferred to the time recorded in the police report, which

13

Brisco's attorney represented was 2249, or 10:49 p.m. On re-direct, the State questioned Tate as follows:

> Q. As far as [defense counsel] just asking you about the time in the police report, if the police report said 2018, that's 8:18; is it not?
>
> A. That's correct.
>
> Q. Not 6:18. Correct. Okay.
>
> A. And that may be where I remember the 18.
>
> Q. So the call would have come in, if -- if it did, around 8:18 that evening.

Brisco's attorney objected, arguing that Tate had testified that he did not know the time. The court overruled the objection and stated that Tate could answer if he knew. Tate then answered that he would have to look at his notes to be absolutely sure. The State then asked if he would agree that the time was 8:18 p.m., to which there was no objection. Tate agreed.

¶30. Brisco claims that her objection should not have been overruled, but we find that the re-direct questioning was proper. On cross-examination it had been established that the best evidence of the time of the call was the time recorded in the police report. Brisco's attorney had misstated the time in the report in his questions to Tate, and the State was merely clarifying that the report showed the time of the call to be 8:18. Brisco's objection was incorrect—Tate had not testified that he did not know the time—and irrelevant to the question asked. There was no abuse of discretion by the court in overruling Brisco's objection.

> B. *Objections to Chris Satcher's testimony concerning the location of blood at the scene*

14

¶31. Brisco next argues that the court erred in failing to sustain her objection to testimony given by Satcher about the location and significance of the blood he found at the scene. Satcher testified that he photographed and observed the crime scene, including the location of blood in the room. He was asked several questions about this, as well as his opinion of the significance of the location of the blood evidence he observed. As discussed below, we find no error by the court in its rulings on her several objections.

1.     Leading questions

¶32. Satcher was asked by the State whether, as part of his investigation, he would try to determine where the primary altercation occurred. Brisco's attorney objected to the question as leading. The court overruled the objection and was correct in doing so. Mississippi Rule of Evidence 611(c) allows questions to develop a witness's testimony. In *Seales v. State*, 138 So. 3d 282, 284 (¶8) (Miss. Ct. App. 2014), for example, we applied this section and found no abuse of discretion when the court allowed a leading question to an arresting officer to develop the preliminary matter of how he became involved in the arrest. Similarly here the State was laying the foundation for the matters that an investigator of a crime scene would explore. Therefore, the objection to leading was properly overruled. In addition, we note after Brisco's objection was overruled, Satcher never answered the question. Instead, the State presented a new question: "So you attempt to find . . . through your investigation . . . locations of importance?" To this question there was no objection, and the failure to object to testimony waives any issue as to its admissibility. *Moore v. State*, 858 So. 2d 190, 195 (¶14) (Miss. Ct. App. 2003). Since Satcher did not answer the question that Brisco had

15

objected to, there was no testimony presented to the jury in response that Brisco could claim prejudiced her in any way. We find, therefore, that the claim of error by asking Satcher a leading question about his investigation has no merit.

2. Expert opinions

¶33. Brisco claims that the trial court allowed Satcher to testify to the movement of the body after Whitaker was stabbed, which Brisco contends constitutes inadmissible expert testimony. Exchanges with the court began with the State's question to Satcher concerning blood shown in photographs on the linoleum by the front door: "Is there anything of interest to you as an investigator located on that linoleum?" There was no objection to the question. Satcher answered: "Just the large quantity of blood that's on the linoleum, a much larger amount than what appears to be on the carpet. It appears that it pooled here and then dropped as he moved to where he fell."

¶34. At this point Brisco's attorney objected, saying that this response was speculative and that Satcher had not been qualified as an expert to give opinion testimony. The court overruled the objection, and the State continued with a question to Satcher about what the large pool of blood meant to him as an investigator. As Satcher was starting to answer—"[t]hat's where the initial altercation . . ."—Brisco's attorney again objected to the conclusions and opinions Satcher was about to give. This time the court sustained the objection unless the State laid a proper predicate. The State questioned Satcher about his education and experience, and then again asked what the large pool of blood meant to him. Again, Brisco's attorney objected, saying that Brisco had not been given notice that Satcher

16

would be testifying as an expert. Although the court was initially inclined to allow the testimony, it decided not to, saying, ". . . it looks like to me that that would be kind of going into an expert analysis. So if we could limit his questions to what he found . . . ." Thus, the record shows that no expert opinions were elicited from Satcher in this line of questioning, so Brisco's claims of error by the court here are meritless.

¶35.   Brisco then argues that expert opinions were elicited from Satcher when he testified about the photographs he took and what each depicted.  When looking at Exhibit 7, the State questioned Satcher as follows:

> [I] [s]how you now what's been marked as State's Exhibit 7, again, a photograph that you have identified as being the front door of the residence with a pool of blood there on the linoleum. Was there anything about that blood that caught your attention or about the condition of the blood or any evidence that may have been associated with that?

There was no objection to this question.  Satcher answered:

> Just that it was not your typical pool of blood.  It had been -- it appeared to have been slid around in something.  It was just -- typically, when you find a pool of blood and something like this has occurred, it hasn't been disturbed. This has been obviously disturbed, moved around, again, and then the bassinet thrown over right here to the right.

There was no objection to this answer. The State continued:

> When you say moved around, can you give an idea of what you mean by that, or do you have any idea about how the blood could have been moved around?

Brisco's attorney objected that the question was eliciting speculation.  The court asked the State to repeat the question: "Anything about the -- what about the blood caused you to believe that it was moved around?"  The court overruled Brisco's objection to this question, and Satcher answered:

17

> If you notice right here, these two lines (indicating), it almost looked like a foot or something like that had been through it, and it -- not wiped or anything. It just looks like there's been something going on in the blood. It wasn't just falling and resting there. There was some kind of movement happening as the blood was being dropped there or as it was dropped there.

Brisco's attorney renewed his objection on the same basis, speculation. Again, the court overruled the objection.

¶36. Brisco argues that Satcher had not been qualified as an expert and that his "opinions" also do not meet the standards of opinions by lay persons under Mississippi Rule of Evidence 701. The State argues that the testimony was not opinion testimony, but merely Satcher's description of the scene and what he observed. The record is clear that Satcher was never qualified or tendered as an expert witness. However, under Rule 701, a lay witness may testify to opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to the clear understanding of his testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." *Sheppard v. State*, 910 So. 2d 1182, 1186-87 (¶9) (Miss. Ct. App. 2005) (citing M.R.E 701). In *Sheppard*, we allowed a law enforcement investigator to testify to the trigger tension on a gun because he had personally fired the gun and because of his past experiences with similar guns. *Id.* at 1187 (¶10). We found this testimony helped the jury decide whether the shooting was accidental or intentional. *Id.*; *see also Reynolds v. State*, 136 So. 3d 452, 459-60 (¶24) (Miss. Ct. App. 2014) (After victim came to neighbor's house carrying a rifle and saying he was concerned for his safety, the neighbor was allowed to testify that the victim was in fear for his life because of defendant's threats.); *Mayers v. State*, 42 So. 3d 33, 34

18

(¶41) (Miss. Ct. App. 2010) (overruled on other grounds by *Sallie v. State*, 155 So. 3d 760, 762 n.1 (Miss. 2015)) (Investigator's testimony as to the path of bullets was nothing more than his opinions based on his personal observation.).

¶37. Likewise, here we find that Satcher's lay opinions are probative of the issue of self-defense. Whether Brisco was blocking the front door and could have avoided the stabbing by letting Whitaker leave was a jury question. Photographs showed that Whitaker ended up in the middle of the room, so the jury had to decide where the actual altercation and stabbing occurred. Satcher was on the scene and personally observed the various locations of blood in the room so his testimony was helpful to the jury. Therefore, we find no error by the court's admission of this testimony.

### 3. Testimony regarding the 911 calls

¶38. Brisco contends that the court erred in allowing testimony from Satcher concerning Whitaker's 911 calls that she contends violated the court's own order that limited such testimony. Before trial, Brisco had moved to prohibit Satcher from testifying about what he believed Whitaker was saying in the unintelligible portions of the 911 calls. The court granted the motion. However, Brisco contends other testimony from Satcher concerning these calls should have been excluded. We disagree.

¶39. During Satcher's direct examination, the State asked about his involvement with the case after gathering evidence on the night of November 18, 2013:

> Q: All right. At the scene that night, you have testified pretty extensively about the evidence you collected, photographs you took, what you saw there. Did you have any more involvement with this case after the night of November 18, 2013?

A.    Yes, sir, I did.

Q.    What happened?

A.    On November the 20th some new information came to light.  I was contacted -- anytime -- now it's kind of automatic with 911. They record everything. In 2013 it was not kind of an automatic thing.  So I always requested, pull me copies of the 911 calls that came in that led up to what--what happened, and this was no different.  I was contacted about the recordings, that they were ready and that I needed to come pick them up and listen to them. So I obtained the -- a disk with the 911 calls from Mr. Whitaker and Ms. Brisco on November the 20th.  It's documented in my report, that I went and pulled the -- again, obtained the 911 calls, listened to the 911 calls.

Q.    And based upon -- well, after hearing the 911 calls, after reviewing those, taking the time to listen to those -- did you listen to them one time, a couple of times?

A.    At least 20 times.

Q.    And after listening to those 911 calls, what steps, if any, did you take after that?

A.    I concluded that we definitely needed to proceed further with the investigation.

Brisco did not object to this line of questioning.

¶40.    During cross-examination, Brisco's attorney asked Satcher to confirm that the 911 dispatcher had said that Whitaker had a knife and was threatening to kill everyone in the home.  Satcher responded affirmatively.

¶41.    On re-direct examination, the State questioned Satcher again about his overall understanding of the 911 call:

Q.    I believe you were asked on cross-examination about the reason why you were responding to that location out on 114 Freedom Lane. And your report indicates and I think you were asked by defense counsel

20

about the fact that 911 had indicated to you that Carl Whitaker was threatening to kill everybody in the residence and he had a knife. Was that the basis that you recollect of the -- of the dispatch that came out to send you to 114 Freedom Lane?

A.      Yes, sir. That's the initial reasoning behind responding.

Q.      And from whom did you get that information?

A.      From the dispatcher that was dispatching us.

Q.      Upon having the opportunity to obtain a copy of the recording of the 911 call that the dispatch operator was referring to, were you able to listen to that 911 recording?

A.      I was and determined that they had missed a lot.

Q.      And was it your determination that, in fact -- or did you come to a different conclusion about the basis of the 911 recording?

At this point, Brisco objected, claiming that the question went beyond the scope of cross-examination and that the questioning violated the court's order on the motion in limine. The court overruled the objection, and we find no error by the court in so doing. The questioning did not run afoul of the motion in limine ruling that had prohibited Satcher from testifying about what the unintelligible parts of the 911 call said. Here, the question to Satcher dealt with how the 911 recordings affected his actions—it led him to open a murder investigation. Brisco had failed to object when the same information was elicited on direct examination. Failure to object acts as a waiver of an issue on appeal. *Havard v. State*, 928 So. 2d 771, 791 (¶34) (Miss. 2006). Notwithstanding this procedural bar, we find that the court committed no error in overruling Brisco's objection. Since Brisco had questioned Satcher about the purpose of the 911 call on cross-examination, there was no error in allowing the State to

question Satcher about it further on re-direct examination. "[M]atters brought out on cross-examination are a proper subject of redirect examination. *Pauley v. State*, 113 So. 3d 557, 563 (¶17) (Miss. 2013).

### 4. Description of wounds

¶42. Brisco next contends that the court erred in allowing Satcher to testify to the nature of the wounds he observed. Again we find no error by the court.

¶43. On direct examination, Satcher was asked what was depicted in Exhibit 14, a photograph of Whitaker's body. In describing it, Satcher pointed out a "slash wound" in one place and "a puncture wound" in another. Satcher also testified to the wounds he observed on Brisco and K.N., saying that photos of both showed "scratches." Brisco's attorney made no objection to this testimony. On cross-examination, Brisco's attorney asked Satcher, referring to one of the photos, "Is that a cut or a scratch, Mr. Satcher?" He answered: "I'm not a doctor, . . . but I would say that's a scratch." Again, Brisco's attorney did not object to the answer. After Brisco's cross-examination, on re-direct, the State showed Satcher Exhibit 14 again and asked Satcher how he would characterize Whitaker's wounds. Brisco's counsel now objected, saying he had not cross-examined Satcher on Exhibit 14. The State replied that it was showing Exhibit 14 so that the jury could see what Satcher considered a "scratch" and what he considered a "cut" or "slash wound." The court overruled Brisco's objection. Satcher answered that he considered Exhibit 14 (Whitaker's wound) a stab or slash wound, and that he considered Exhibit 17 (K.N.'s wound) a scratch. He also testified to a scratch he observed on Brisco. Brisco again objected, saying that the testimony bordered

on a medical opinion, which Satcher was not qualified to give.

¶44.    We find that Brisco's attorney had opened the door to Satcher's testimony on re-direct by the questions he asked Satcher on cross-examination. A defendant cannot complain on appeal about errors he invited, nor can he claim error when he opens the door. *Rubenstein v. State*, 941 So. 2d 735, 755 (¶53) (Miss. 2006). Moreover, Satcher was not giving a medical opinion, but merely testifying about his personal observations of the parties' wounds, much akin to the officer's testimony of the victim's and defendant's wounds in *Hicks v. State*, 6 So. 3d 1099, 1103 (¶16) (Miss. Ct. App. 2008), *cert. denied* 11 So. 3d 1250 (Miss. 2009). There, we found that such testimony was admissible as a factual description of what the officer had observed. Accordingly, we find no error by the court in the admission of Satcher's testimony as well.

## C.    Questions to Z.N.

¶45.    In addition to claims of error with respect to Satcher's testimony, Brisco alleges errors with respect to the admission of testimony of the minor children. Both children, K.N. and Z.N., were taken to the sheriff's department the night of the incident. They were seated with Brisco on a bench outside the interrogation room waiting their turn. At trial, the State asked Z.N.: "So what conversations, if any, did Ms. Brisco have with you while you're sitting there waiting to tell Mr. Traxler what happened?" Brisco's attorney objected on the grounds of hearsay. The court overruled the objection and Z.N. replied: "Well, she was just kind of telling me the whole story of how it went, how it happened, the stabbing occurred. That's basically -- I said exactly what she said." The State argues that this testimony, if it is

23

considered hearsay, was introduced solely to explain why Z.N. told her questioners what she did, i.e., that she was present when Whitaker was stabbed, when, in fact, she was not.

¶46.    Rule 801(c) of the Mississippi Rules of Evidence defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Under Rule 801(d)(2) an admission by a party opponent is not hearsay. "A party's own statement is the classic example of an admission." M.R.E. 801 *Advisory Committee's Note.* What a defendant in a criminal case communicates to a witness is not hearsay. *Corrothers v. State*, 148 So. 3d 278, 313 (¶91) (Miss. 2014). Therefore, the court here was correct in overruling Brisco's objection to the conversation Brisco had with Z.N. Moreover, an out-of-court statement offered to show its effect on the listener is allowed as well. *Bennett v. State*, 76 So. 3d 736, 746 (¶45) (Miss. Ct. App. 2011). For example, in a sexual battery case, statements made by the brother of a victim to the victim's mother were not hearsay because they were not admitted to prove the truth of the matter, but rather to show why the victim's mother went to the back room where she found the victim. *Pickett v. State*, 143 So. 3d 596, 600-01 (¶15) (Miss. Ct. App. 2013).

¶47.    Here, we agree that Z.N.'s testimony concerning Brisco's conversation with her while waiting to be questioned was admissible under Rule 801(d)(2) as an admission by an opposing party, or, in the alternative, to show why Z.N. told interrogators what she did. Therefore, there was no error in the admission of this testimony.

        D.    *Questions to K.N.*

¶48. Brisco argues that the court committed reversible error when it denied her objections to leading questions put to K.N. The first exchange concerned testimony that Brisco was sitting in a chair in front of the door. The State questioned K.N. as follows:

Q: Okay. Why did she sit in that chair in front of that door?

A. [Whitaker] wanted to leave.

Q. Okay. Why wouldn't she let him leave?

[Defense]: Objection, Your Honor. That calls for speculation.

THE COURT: Sustained.

[Defense]: Thank you.

A: So she would not let [Whitaker] leave.

[Defense]: Objection as to leading, Your Honor.

[State]: Judge, he just --

THE COURT: Overruled.

¶49. The second objection as to leading was raised when K.N. was testifying about Whitaker's charging Brisco with his knife:

Q: She had the knife like this (indicating)?

A. Yes, ma'am.

Q. When he's coming toward her?

A. Before he came towards her.

Q. Before he came toward her.

A. When he came -- yes, ma'am, when he came around the couch.

Q. So he's coming around the couch, and is she at that point in time making threatening gestures with the knife?

A. Because he was hollering, "Let me out." He was telling her, telling her to let him out, but she wouldn't let him go for her money.

Q. Okay. So she wouldn't let him go for her money, and he's coming around the couch. And before he gets there

[Defense]: Your Honor, this is a leading question.

[State]: I'm –

THE COURT: Overruled.

¶50. "A leading question is one that suggests to the witness the specific answer desired by the examining attorney." *Magee v. State*, 124 So. 3d 71, 77 (¶18) (Miss. Ct. App. 2012). The decision to allow leading questions is within the sound discretion of the court. *Id.* "Unless there has been a manifest abuse of discretion resulting in injury to the complaining party, we will not reverse the decision." *Mosby v. State*, 749 So. 2d 1090, 1093 (¶9) (Miss. Ct. App. 1999). We see no reason to reverse the court's decisions in the exchanges with K.N. that Brisco raises. In both instances, we find no "leading" by the State. In both the State was merely repeating what the witness had already testified to without objection. No words were put in the witness's mouth. There was only a repetition by the State of words that had already come out without objection. Therefore, this claim of error has no merit.

**V.    Whether the verdict was against the overwhelming weight of the evidence.**

¶51. Brisco argues that the verdict was against the overwhelming weight of the evidence and that the court erred in not granting her motion for a judgment notwithstanding the verdict

26

or a new trial. We find no error by the court in its ruling.

¶52. "A motion for a [judgment notwithstanding the verdict] challenges the legal sufficiency of the evidence"; "on the other hand, a motion for a new trial challenges the weight of the evidence." *Powell v. State*, 240 So. 3d 449, 455 (¶23) (Miss. Ct. App. 2017) (citing *Bush v. State*, 895 So. 2d 836, 843-44 (¶¶16, 18) (Miss. 2005), abrogated on other grounds by *Little v. State*, 233 So. 3d 288, 292 (¶19) (Miss. 2017)).

¶53. This Court has articulated the following standard of review in determining whether a jury verdict is against the overwhelming weight of the evidence:

> This Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. *Collins v. State*, 757 So. 2d 335, 337 (¶5) (Miss. Ct. App. 2000). Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal.

*Sanders v. State*, 32 So. 3d 1214, 1217 (¶10) (Miss. Ct. App. 2009) (citation and internal quotation marks omitted). "[T]he prosecution must be given the benefit of all reasonable inferences that can be reasonably drawn from the evidence." *Jerninghan v. State*, 910 So. 2d 748, 751 (¶6) (Miss. Ct. App. 2005). The supreme court has stated that "the relevant question is whether after viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found essential elements of the crime beyond a reasonable doubt." *Hoffman v. State*, 189 So. 3d 715, 720 (¶21) (Miss. Ct. App. 2016) (quoting *Bush*, 895 So. 2d at 843 (¶6)). Under this standard, "the [S]tate receives the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Hughes v. State*, 983 So. 2d 270, 276 (¶11) (Miss. 2008).

27

¶54. As previously stated, a motion for a new trial challenges the weight of the evidence. *McCray v. State*, 263 So. 3d 1021, 1028 (¶21) (Miss. Ct. App. 2018) (citing *Leonard v. State*, 972 So. 2d 24, 30 (¶22) (Miss. Ct. App. 2008)). And a reversal is warranted only if the trial court abused its discretion in denying the motion. *Dilworth v. State*, 909 So. 2d 731, 737 (¶20) (Miss. 2005). "In reviewing a challenge to the weight of the evidence, a reversal is warranted only if the lower court abused its discretion in denying the motion. The verdict must be so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Cooley v. State*, 271 So. 3d 765, 773 (¶31) (Miss. Ct. App. 2018) (internal citation and question marks omitted). The evidence again is weighed in the light most favorable to the verdict. *Id.*

¶55. Brisco was indicted for the deliberate design murder of Whitaker under Mississippi Code Annotated section 97-3-19 (Rev. 2014). Under section 97-3-47 (Rev. 2014), "[e]very other killing of a human being, by the act, procurement, or culpable negligence of another, . . . shall be manslaughter." Therefore, culpable negligence manslaughter is a lesser-included offense to the charge of murder. In this case the jury was instructed on the elements of each. S-1 identified the elements of deliberate design murder; S-3 listed the elements of culpable negligence manslaughter (willfully, unlawfully, and feloniously killing Whitaker, with culpable negligence, by stabbing him with a knife without deliberate design to kill him, and not in self-defense).[4] The term "culpable negligence" was defined in jury instruction S-4 as

---

[4] The statutory elements of culpable negligence manslaughter are "an unlawful killing by the culpable negligence of another." *Williams v. State*, 31 So. 3d 69, 79 (¶31) (Miss. Ct. App. 2010).

28

"negligence of a degree so gross as to be tantamount to a wanton disregard, or utter indifference to, the safety of a human life." Brisco raised no objection to any of these instructions nor does she raise any on appeal. Brisco merely claims that the weight of the evidence presented outweighed the jury's verdict of culpable negligence manslaughter. She makes the same argument to us that she made to the jury: that she pressed charges against Whitaker in April for threatening her and her baby; that on the night of November 18, 2013, Whitaker was drunk and had ingested drugs that increased his aggression; that because of this condition, Whitaker became angry over a small debt Brisco asked him to pay; that Whitaker armed himself with a knife and was so angry that he threw a bassinet at fourteen-year-old K.N.; that he called 911, faking an emergency and telling the dispatcher that he had been stabbed, when he had not been; that he then charged at Brisco, pinned her down, and inflicted cuts on her before K.N. stabbed him in Brisco's defense; and that knowing that Whitaker had stabbed someone in the past, as Whitaker raised up, Brisco stabbed him in self-defense.

¶56. Countering this, the State argues that Whitaker's past conviction was in 2000, thirteen years before this incident. Moreover, even though Brisco filed charges against Whitaker in April 2013, she had reconciled with him and actually allowed him to come into her home with alcohol and to get drunk. When Whitaker became angry over the debt owed, K.N. and Z.N. both testified that Brisco sat in front of the door and prevented Whitaker from leaving. That Whitaker wanted to leave is confirmed by the 911 call he made. Moreover, the blood spatters on the door itself and the pool of blood on the entryway showed that Whitaker was stabbed by the door that Brisco had blocked. Thus the State contents there was no need for

29

any alleged self-defense actions had Brisco just opened the door and let Whitaker leave.

¶57. When assessing the claim that a conviction is contrary to the weight of the evidence, we defer to the discretion of the trial judge. *Jackson v. State*, 68 So. 3d 709, 720 (¶37) (Miss. Ct. App. 2011). "[W]e will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice." *Id*. Moreover, "[t]he power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Cooley*, 271 So. 3d at 773-74 (¶31). Here, the evidence is such that, giving the State the benefit of all reasonable inferences, reasonable jurors could find that each element of culpable manslaughter was proven. We are not convinced that the verdict is so contrary to the evidence that allowing Brisco's conviction to stand would sanction an unconscionable injustice. Accordingly, this contention of error is without merit.

VI.     **Whether the court erred in allowing the State to argue to the jury what was said on the 911 calls.**

¶58. Brisco claims that the circuit court violated its own order when it allowed the State to argue to the jury what the State felt was said in Whitaker's 911 calls. The order Brisco refers to is the court's ruling that Satcher could not interpret the unintelligible portions of Whitaker's 911 calls. The court limited the evidence to the 911 calls themselves and what they led Satcher to do. Despite this ruling, Brisco argues that the court then allowed the State to argue its interpretation of these unintelligible parts to the jury in closing. Brisco provides no legal authority for this claim of error. Failure to cite legal authority in support of an issue is a procedural bar on appeal. *Byrd v. State*, 179 So. 3d 64, 66 (¶7) (Miss. Ct. App. 2015)

(citing *Young v. State*, 919 So. 2d 1047, 1049 (¶5) (Miss. Ct. App. 2005)). Moreover, Brisco

failed to object to the State's opening statement or closing argument—again waiving this

issue on appeal. *Thorson v. State*, 895 So. 2d 85, 112 (¶64) (Miss. 2004).

¶59. Notwithstanding the procedural bars to considering this issue, we find it meritless.

Arguments of counsel in opening do not constitute evidence, *Keller v. State*, 138 So. 3d 817,

861 (¶113) (Miss. 2014), nor do arguments made in closing, *Henton v. State*, 752 So. 2d 406,

409 (¶11) (Miss. 1999). Moreover, reversal is not required when a jury is properly instructed

that statements made by counsel are not evidence. *Id*. Here, the jury was so instructed, and

the jury is presumed to have followed the directions of the trial judge. *Catchings v. State*,

39 So. 3d 943, 949 (¶22) (Miss. Ct. App. 2009). The State's opening statements and closing

arguments in Brisco's case did not run afoul of the court's order or any principle of law.

### VII.    Whether the court erred in granting instruction S-5A.

¶60. Brisco next argues that the court erred in giving instruction S-5A, which she contends

is a misstatement of the law. S-5A reads:

> The Court instructs the jury that a person may not use more force than
> reasonably appears necessary to save her life or protect herself or others from
> great bodily harm. The question of whether she was justified in using the
> weapon is for determination by the jury.

> The law tolerates no justification and accepts no excuse for the use of a deadly
> weapon on the pleas of self[-]defense except that the use of the weapon by the
> defendant on . . . Carl Whitaker was necessary or apparently so to protect the
> defendant's own life or her person or that of others from great bodily harm and
> there was immediate danger of such design being accomplished. The danger
> to life or of great personal injury must be or reasonably appears to be
> imminent, and present at the time the defendant commits the act with a deadly
> weapon. The term "apparent" as used in "apparent danger" means such overt,
> actual demonstration by conduct and acts of a design to take life or do some

31

great personal injury to the defendant or others as would make the use of the weapon necessary for self-preservation or escape great bodily harm of self or others.

The State argues that this jury instruction was taken, almost word for word, without criticism, from *Thomas v. State*, 145 So. 3d 687, 692 (¶23) (Miss. Ct. App. 2013).

¶61. Jury instructions are within the discretion of the court, and we review the court's rulings on them for an abuse of discretion. *McCoy v. State*, 196 So. 3d 1007, 1009 (¶4) (Miss. Ct. App. 2015) (citing *Harris v. State*, 85 So. 3d 300, 304-305 (¶11) (Miss. Ct. App. 2012)). Instructions must be read as a whole, and if they fairly state the law of the case and create no injustice, no reversible error will be found. *Thomas,* 145 So. 3d at 690 (¶14). This principle was discussed by the supreme court in *Spires v. State*, 10 So. 3d 477 (Miss. 2009), where the defendant claimed error when his proposed "stand your ground" instruction was denied. The Court said that the other instructions given—including this very same instruction that Brisco argues as erroneous here—fairly reflected the defendant's defense. *Id.* at 484 (¶¶32, 35). We ourselves had found no error with instruction S-5A in the *Thomas* case. *Thomas,* 145 So. 3d at 694 (¶26).

¶62. Here, the court gave all instructions proposed by Brisco including two that dealt with self-defense. The jury was also instructed that the State had to prove that Brisco's actions were not necessary for self-defense. Accordingly, we find the court did not abuse its discretion in giving jury instruction S-5A.

### VIII. Whether Brisco was provided ineffective counsel.

¶63. To prevail on an ineffective-assistance-of-counsel claim, a defendant must show that

32

his counsel made errors so serious that he or she was not functioning as the counsel guaranteed to the defendant by the Sixth Amendment, and that the attorney's errors were so serious as to deprive the defendant of a fair trial. *Swinney v. State*, 241 So. 3d 599, 613 (¶59) (Miss. 2018). Brisco raises ineffective assistance of counsel at trial as an issue on appeal. But because appellate courts are limited to the trial record on direct appeal, generally ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings. *Pace v. State*, 242 So. 3d 107, 118 (¶28) (Miss. 2018). We believe that Brisco's claims would be better developed through a petition for post-conviction relief (PCR). Accordingly, Brisco's claims to ineffective counsel are dismissed without prejudice to her right to raise the issues in a properly filed PCR petition.

## CONCLUSION

¶64. Finding no merit to Brisco's claims of error, we affirm the conviction and sentence of the Warren County Circuit Court. Brisco's claims of ineffective counsel are dismissed without prejudice to her right to raise those issues in a properly filed PCR petition.

¶65. **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., WESTBROOKS, TINDELL, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**